We will hear argument next in case number 251038, Piranha Media Distribution against Hulu. Good morning, your honors, and may it please the court. I expect to reserve about three minutes for rebuttal with the court's permission. Representative Claim 1 focuses on sequencing and adaptively re-sequencing ad blocks within a digital media content stream and temporarily disabling user controls. According to the specification and complaint, this invention revolutionized digital media distribution because there was previously no method for preserving distributor-directed control of media sequencing. Claim 1 is eligible at step one because the claim recites a specific technological improvement to your solution to a problem rooted in digital media players, and it's also eligible at step two because the complaint and specification plausibly allege a unconventional improvement to digital media player functionality. Turning first to step one. Let me ask you one housekeeping question before you get into the steps. You mentioned that Claim 1 of the 403 patent is representative of all asserted claims across both patents. Is that true? Yes, your honor. That's the way it was litigated below. So turning then to step one, I want to start with the problem. Don't start with the problem. That's not the problem for you. The problem for you is whether these words, specific technological solution, are really apt for what's going on here. Yes, your honor. And I think they absolutely are given the, I think, highly detailed steps that are outlined in this claim. And we've got, in our reply brief, we've got a chart or sort of a diagram at pages 12 and 13. I know we go through this in 101 cases after 101 case after 101 case. The fact that there's lots of detail is not enough if all the detail is at every single step of the way functional and not about what we would call a technically identified step. Why isn't this one of those cases where all of the details are just functional? If somebody is skipping around, then you want to get them with your ad where they are. And also, by the way, make sure they can't turn the volume down. Yes, your honor. I don't believe those are functional steps. The claim doesn't recite the results of simply disallowing someone from skipping ads. It goes through the technical process of computer processors assigned specific tasks of creating initial ad insertion points and then modifying them based on a particular genus of rules that are also recited in the claims. The rules have to satisfy certain selection criteria. And they have to, in response to a specific type of user input, which is the user updating the current play position, applying these adaptive preference rules, a specific genus of rules similar to what this court dealt with in the McGrow case, which was about sort of automating this lip syncing of animation. The claim there applied a specific genus of rules to accomplish that. We have a similar type of adaptive preference rules here that are applied when the user updates the play position. And then finally, the... Counsel, how do you distinguish the electric power group? I think the best way to understand it is about a process that can occur entirely in someone's mind. The system in that case received information and made what was essentially a human judgment about vulnerabilities in the system. There is no... This case is more like what the technology this court dealt with in SRI, where the court said it rejected that exact analogy to electric power group and said this monitoring of a network and routing information to hierarchical monitors is simply not the kind of human activity that Section 101 is meant to exclude. It's not something the human mind is equipped to do. Here as well, moving ad blocks within a digital content stream, simply not something the human mind is equipped to do. It's a computer processor function executing specific steps that are outlined and detailed in the claim. Again, coming back to this notion of result-oriented type claiming, we do not claim the result of preventing users from skipping ads. In fact, the claimed functionality, as we explain in our briefing, enables users to skip ads but carries out a technological process so that the user is required to experience the ad anyway because the ad is re-sequenced within the content stream. We don't simply claim the result of moving ads around. We claim a specific technological method of moving the ads around. I have a hard time with that last assertion. It doesn't seem that it's super specific about how it's done. It just says basically if the user's watching something and they move around, then you take a look at what the previous one is and then you just redistribute the ads, right, under whatever rules you want. I think we claim certainly as much specificity and detail as many of the, I think, analogous cases. I would direct the court's attention to FinGen or Ancora, for example. I don't know the second one off the top of my head, but FinGen was an entirely new data tag or structure that was specifically talked about. This was just moving ads around in a playback stream and maybe I'm running into the of, I understand what this does because it frustrates me as it should as the advertisers want when I'm watching Netflix or Amazon or whatever, but I have to watch ads, whereas I don't quite fully grasp the technology of FinGen, but it does seem to me that it was more specifically described and that how it was done was much more in technological terms rather than this, which is there's a bunch of preset rules that force a user to watch the ads. I think that's sufficient specificity, Your Honor. I mean, I think there's, you know, we've got the trigger condition, we've got the boundaries that the rules have to follow, the conditions the new ad sequencing points have to meet. I think in pressing any further, you can always ask, yes, but how? I mean, yes, but how? You could do that ad infinitum. At some point it becomes, and I think clearly here it becomes, a 112 type of issue and there's tons, for example, around, I think it's around appendix 52, 53, there's a bunch of discussion in the specification around figure 7a and 7b, gives more implementation detail, but as far as the claim goes, this is about a specific software steps, I think, as you would see or as is realistic to claim. Do you think that VCRs were used in the past to manipulate media to skip ads? VCRs I think posed a fundamentally different problem because there was no way for the distributor to lose control over sequencing. When you're talking about an analog tape, you can watch it forwards or backwards, you can speed it up, you can slow it down, but there's no way to arbitrarily and instantaneously move about in the content, and so the evolution to digital technology created this new, powerful way for consumers to manipulate content in a way that was not available in the tape era. It actually seems kind of the reverse. If you have a VCR and you record a program from live TV that has ads, they could never, because of the way the VCRs work, they could never force the user to watch the ads. So I think maybe your point is similar, that this technological environment gives more tools to the distributors than you could under the old system. The old record system, if I wanted to record something on a DVD or VCR, ABC could not tell me I can't skip an ad. I think technologically there was no way. I mean, if it was a pre-recorded tape, maybe, but on a home-recorded one, certainly not. Your view is this is confined to a technological solution because it's a digital media playback that actually does allow the distributors to program a way to prevent users from skipping ads, and that you think that the specifics, and I guess we're looking basically at the inter-splicer stuff, and mostly at, you don't have numbers for them, but at least one of the more, and then the one or more, such that the last three paragraphs of the inter-splicer, your view, the specificity to make this a non-abstract idea. Yes, I think that's basically right. I mean, I think we obviously lean on the disabling the user controls as well, the whole claimed combination, but I think maybe a helpful illustration, because I do think tape is probably the closest analog, but of course it's not enough to simply have a loose analogy to some kind of linear nature of tape. Our solution wouldn't be applicable to tape. I mean, there was no way to move tape blocks around on the fly. Well, when somebody puts a tape in and hits play, there's no way to move the ads on the fly to accommodate someone fast forward, and so we're, again, not just computerizing something. On VCR, I guess I referenced DVDs, but I think DVDs might have been able to be coded so you couldn't actually move on to the next segment until you watched an ad probably. So turning then, I've only got a little bit of time before I'll be into my rebuttal, but let me just briefly talk about step two. If the court were to determine that the focus of the claim is abstract, I think the spec and the complaint here include a really remarkable level of detail. The specification goes... But isn't your argument on step two basically the same argument about step one, that it's not abstract because it actually discloses this problem? That's a huge new solution. I don't understand, if we agreed with this argument, why we would ever get to step two. If it's an abstract idea, just restating it as a revolutionary abstract idea is not going to help you, but if we find it's not abstract because it does something you couldn't do in a non-digital media realm like this, then you win at step one. We don't need... Well, I think even if the court were to find the focus abstract, the detail in the specification explaining... That's always a problem. The spec doesn't count all by itself. Well, there are many cases, for example, Co-op versus Collective relied on description in the spec that was then mirrored in the complaint, which I believe is what we have here. No, no, no. You have to have something in the claim that amounts to an inventive concept, and if you have a claim that is abstract because completely functional, you don't get to say, ah, um, the spec supplies the inventive concept. Yes, Your Honor, but I think certainly the alleged inventive concept here, which is this new functionality, completely new functionality in media players. I mean, our allegation is that this adaptive on-the-fly resequencing was new, full stop. It was novel functionality. It was inventive. That's alleged in the complaint, and that functionality is explicitly claimed, so we believe we went on step one, but if not, we believe we went on step two. This is my point. If we agree with you on that, you went on step one because it's claiming a specific new novel technique, but if we view this as just an abstract functional claim, then it's the same claim, the same argument you're to win on step one and step two. We don't need to, either you lose on both, or you don't need to get to step two. Well, I certainly think we went on step one. I do think our complaint adds, you know, some plausible allegations that the district court erred in disregarding. Thank you. May it please the court, Harper Batts on behalf of Apelli Hulu. I do want to start with what the district court did, because this is an appeal from the district court, and the district court considered the arguments that Piranha raised below, and even adopted their proposed claim construction of interspicer for purposes of deciding the one-on-one motion, and they correctly rejected the comparisons to the case law that Piranha actually cited below, the Finjen case and the Ancora case that we're talking about, and instead found that the claims were more analogous to the electric power group and ultra-mercial claims, and I think we kind of jumped ahead here a little bit by moving immediately to... We're doing de novo review, right? Correct. So the fact that the district court did a perfectly wonderful job is kind of neither here nor there, unless you explain why it was correct. So why don't you just get right to that? Sure. So my point of this, Your Honor, is that their arguments below are materially different, completely different, from the arguments that they're raising here. Their arguments, and I'd like to just go to appendix page 552, and it also goes to Judge Cunningham's point about the problem. If we look at page 552, they made the arguments in combination with their construction of interspicer, which included this concept of digital rights management software. They're complaining that the district court erred by saying that the concept is displaying an advertisement in exchange for access to copyrighted media. That's their complaint, but that's what their interspicer construction proposed, and then if you look at line 14 of page 552, they talk about what is the problem. The problem is preventing users from skipping over or otherwise avoiding advertisements, and then they talk about for the copyright holders, and they say this is a problem with all form, with many if not all forms of pre-existing media distribution. So the problem that they identified when they were arguing was the problem was a problem that existed even with newspapers, where you'd intersperse advertisements inside of a newspaper. We gave the VCR example. I have other examples I'd like to get into, but I want to finish on page 552 because I think this is very instructive. At the bottom, when they're trying to analogize, their strategy at district court was to analogize the claims to ANCORA and FINGEN and say these are security improvement claims. That's what the district court rejected, and they said here the claims of the patent suit are directed to software, including interspicer, that improves security by preventing unauthorized use of copyright digital media content. That was their argument. They have completely flipped their argument now on appeal, and I believe he said at the beginning, he said moving ad blocks within a digital media stream. Now I think that almost in some ways goes back to our original argument in district court, which was ad resequencing is an abstract idea, so I'll address that, but I do think there is a forfeiture issue. If we assume that ad resequencing itself is an abstract idea, the notion of using the technological benefits of streaming, which weren't available for a VCR or even a newspaper, you know, you can't force the reader to read every single column in the newspaper. Why isn't how they accomplished this, and this is where I think it's a little bit hard to figure out for me, the idea of forcing the user to watch ads is abstract. I think I would agree with you, but if they have a specific way of doing it, and that they claim the specific way of doing it with rules and like recalculating, and there's some specificity here, at least in the bottom three paragraphs. Why is that enough to solve the how to implement the abstract idea? Because our one-on-one case, particularly in the software stuff, is always saying you can't just claim the idea. You have to claim how you implement that idea. This seems pretty close to me to showing how they implement that idea. I think I'd have three points on that, your honor. I think the first point I would is point to the a lot of case law that this court has already released about whether using criteria conditions or user input is abstract, and I do think the Enbridge and Post Inc versus Verizon case that we cited is quite instructive on this point, because it goes back to... Can I just ask you then, if you have this idea, and I mean I think it's a good idea, I mean you definitely, you know, I have to sit and watch through ads now like I did when I was a kid growing up in the 70s and 80s if I wanted to watch a TV show, which I didn't have to do maybe five years ago or 10 years ago. If that's the idea you want to implement, how would you write the claim to implement that idea that's different than this? Okay, so I want to go back to the first... I will answer that question, but I want to go back to the first premise of your question, this concept of how it's new. Think about back in... I don't want to argue about that. I understand, but I don't want to argue that. I'm interested... I'm concluding that this force watching of ads for streaming playback is some... it could be a patent eligible concept if it's claimed properly, and I want to know from you what you think is deficient in this and what they would need to add to make it claim properly. They would have to have like a soft... an explanation of the software that's being used, the actual like the actual code. The algorithm. The algorithm or something. Why is this an algorithm? It says if a user changes the playback position, then here's a set of rules, and you're not going to write down every single possible solution because one, you can't, and two, everybody would just design around it, but the concept is once the user advances the playback, then the software kicks in to recalculate the new digital stream, and there are underlying assumptions. We can guess the specification probably talks about some what they are. Maybe you have, you know, it's an hour-long show that was supposed to have four ads, and you fast forward through 20 minutes of the show because you don't want to watch it, which includes one ad that you skipped. It looks at the remaining 40 minutes, and it recalculates and puts those four ads back in. That sounds like pretty specific steps that are at least somewhat reflected here in these last three paragraphs. Why isn't that enough? I guess you're asking me the hypothetical of... the PTAB, when it looked at this on appendix page 404, said this re-sequencing is insufficient. This is just generic language. It's functional language. It's result-oriented language. The judge found the same. I view it the same way. You're asking me what language could be enough? I don't know that I can answer that because that's the language we have. It doesn't claim re-sequencing alone. If it was just, you know, if somebody fast forward to re-sequence so the same ads are shown, sure. That sounds very high level. It says, you know, according to selective criteria defined by rules, taking in account the new play position, and at least a length of time, redoing it. And that's for... I'm paraphrasing. Why... I don't understand. My problem is I don't understand how you write a patent claim that claims what they is their invention that would be enforceable against anybody because if we require the level of detail that I think you want us to require, it would be easy to design around. I think this goes squarely into the claims, not just electric power group claims, but it goes into the claims on the Verizon case, the Capital One case, and the Accenture group case. I know, but I would not like to talk about that precedent. I understand. You have a very strong case based upon the precedent and stuff like that. My problem is this seems to me like a concept that should be patent eligible and that you should be able to write a patent claim that covers it and is that is enforceable against infringers, and I don't know how you do it except for the way it's done here. So what is the concept, do you believe, that when you say the concept? You don't get to ask me questions. Okay, well then I would say the concept, you can click on a link on the internet and it would force you to watch an advertisement. That was well before any sort of streaming of media. Well, this is not an obviousness case. But then that goes to the concept of forced viewing. It's still in response to a user input making someone watch content or a recommendation. Look, I get that's a very general functional level claim. They don't get a patent if they just write a patent that says, you know, we claim all methods for forcing a viewer to watch ads during a streaming, whether they fast forward or not. They don't get a patent for that. I'd say that's what the claims are currently. Well, what do you do with this language about specific steps? They're pretty specific steps. This is a problem with software is you have to claim them in functional language because we're in the realm of software. That's the way it works. I don't The distinguishing factor that I would have is that they are not specific steps. They are lengthy steps. So they're still going to abstract concepts. They put a lot of apps, different abstract concepts in there, but they're still just high level functional results. What, how do you perform any of these steps? Where does it say, actually, how are you performing these? They aren't claiming means plus function. If instead of the kind of more general way, they would say the processor determines the amount of time left in the program and then determines the amount of ads that the distributor wanted to have seen. And based on that, calculate a new data stream that specifically places the number of ads into the time remaining. Would that be sufficient? It's certainly getting closer. Yeah. I mean, that's pretty close to what it says here. It just doesn't, you know, do it that explicitly. I'm happy to look at any limitation with you, but when you walk through the limitations of saying you cause a presentation to be shown or you have a memory storing a data place for where it's stored, these are all just, again, functional language of, hey, this is what we'd like to do, rather than a specific of how to actually implement it, how to actually do it. And that goes back to, I guess, the struggle that I have is when we The last two clauses of the such that paragraph kind of seem like they're saying what I just said, that after you do the new alternative sequence insertion points, it satisfies conditions accepted from the play position being a predetermined length of time after the new play position and that the play position being a predetermined number of digital media data blocks after the new play position. That sounds exactly what I just said, which is you look at new time and you put in the number of ads in that new time. But looking at those are, I guess, I'm going back and forth with you on the case law because that's similar to the claims that were found abstract. I do want to go back, though. I do think when we're talking about this, whether this is something that's new, even like NFL broadcasts in the back in the day, you didn't have a determined time when you're going to commercial. They had to make determinations on when to pop up a commercial, when there was a timeout, an injury, a touchdown. By that logic, you guys have for decades been hearing oral arguments. It's not like people don't resequence what they're going to say in response to what you're doing. So the concept of resequencing, the intellectual ventures case and the Verizon case, another case I said, all are for these types of rules that are just general rules are not patent eligible. So I think I'm going to the step above what you were going to. Yeah, I get it. I do think that's an issue. Resequencing, you're absolutely right on. That's an abstract idea. But resequencing in a way so that the user can't avoid hearing the argument is a different story. I mean, you can resequence your argument all you want. If I don't want to listen to it, I'm not going to listen to it and you can't make me. But the problem that you're doing there, I think, Your Honor, is you're conflating the concept, the mental process of forcing an ad, which I don't think they're really contesting. It's a mental process. That's what the PTAB said. That's what the judge said. It's a mental process to force watch with resequencing. And then on resequencing, we're still going back to all these other cases where you're just redisplaying information. And that goes back to like recommendation engines. What are you doing? You're just simply looking at what is the content, what some input by the user, and then spitting out something that the user has to watch. That's what the Verizon case had. That's what the other three cases that I mentioned, intellectual venture cases, had. So responses to a user input, like a fast forward, are still problematic for them. And I do want to address that point. Do you still dispute, and I thought this was prevalent in your briefing in particular, that this is necessarily a technological solution to a technological problem? It isn't because this is still just an abstract concept of resequencing. And I think if you look at the VCR example that we gave, if you look at claim nine, the dependent claim nine, the functionalities that they're citing to as examples are fast forwarding, rewinding. They're saying these are the types of things that we're trying to cover as the types of functionalities that we would then force an ad or resequence an ad. Well, that's exactly the type of functionalities that VCR had. And in their reply brief, they had really no response for that. They said, well, VCR wasn't as good at doing fast forwarding. Well, whether it's as good or not doesn't take away that their claim is broad and encompassing fast forwarding and rewinding capabilities that were already there. Any further questions? Thank you. Thank you.  this court has never held that a software invention, in order to be eligible, has to claim or set out an algorithm or computer code needed to actually execute the claimed software steps. In Weisner versus Google in 2022, this court case law is not going to advance, at least my understanding. So you have a stream of bits. That is what somebody is watching. It takes place over time. If you're going to move an ad, then you need to either, as this says, either do it by a certain amount of time or a certain number of bits, because those two are perfectly correlated with a digital stream. So how does adding that such that clause, for example, which says, you know, use one or the other of these two things, move even one inch beyond resequence into what the person is now paying attention to? It's a specific way of doing it that doesn't cover all ways of resequencing. There would be ways. You're just describing an inherent feature of the new context. Well, we're talking about doing it in a specific way. It doesn't broadly preempt ways to resequence content. You could do it randomly. You could do it various ways, as we explain in our brief, that wouldn't be preempted by these claims. But I think the principle that distinguishes the cases finding computerizing conventional functions is that there's no conventional analog to this functionality. There's no mental steps analog to this functionality. And I think we claim how to do it as specifically as one possibly could without putting an algorithm or computer code into the claim itself. Thank you. Thanks to all counsel. Case is submitted.